United States District Court
Southern District of Texas
**ENTERED**
August 28, 2018
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| MICHAEL K. TOMEK | § | |
| Plaintiff, | § § § | |
| VS. | § § | CIVIL ACTION NO. 3:17-CV-00340 |
| STP NUCLEAR OPERATING CO. | § § § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION

Pending before the Court is Defendant STP Nuclear Operating Company's Motion for Summary Judgment Based on Preemption ("STP's Motion for Summary Judgment"). Dkt. 16. All dispositive pretrial motions in this case were referred to this Court for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Dkt. 18. Having considered the motion, response, reply, and applicable law, the Court RECOMMENDS that STP's Motion for Summary Judgment be GRANTED and the case dismissed.

### I. BACKGROUND

STP Nuclear Operating Company ("STP") owns and operates a nuclear power plant in Matagorda County, Texas. For 31 years, STP employed Plaintiff Michael K. Tomek ("Tomek"), most recently as a Supervisor in the Radiation Protection Unit.

On October 18, 2016, Tomek got off work at 6:00 a.m. After work, Tomek consumed four beers and one cocktail before going to sleep around 9:30 a.m. When Tomek returned to work at 5:00 p.m. that same day, he was subjected to a random

breathalyzer and urine test in accordance with STP's fitness for duty protocol. The breathalyzer test indicated Tomek tested positive for alcohol with a Blood Alcohol Content ("BAC") of .041%. Tomek took a confirmatory test a few minutes later and he again tested positive for alcohol, this time with a BAC of .042%. Because of the failed alcohol tests, and in accordance with company policy, STP denied Tomek unescorted access at the STP plant for five years. His employment at STP was formally terminated on October 19, 2016.

Tomek criticizes the testing process utilized by STP, alleging the same breathalyzer was used for both tests and was not cleaned between the two tests, and the machine was inaccurate. Tomek further claims the positive alcohol test was incorrect because he did not consume alcohol within five hours of starting his shift. Tomek alleges the administrator of the test violated STP's policy because the administrator did not ask him if he had belched within the previous 15 minutes.

Tomek originally filed suit against STP in the 130th Judicial District Court of Matagorda County, Texas. Tomek brought two state law claims: a discrimination claim under the Texas Commission on Human Rights Act ("TCHRA") and a state common law defamation claim. As far as the TCHRA claim is concerned, Tomek alleged that STP discriminated against him on the basis of a perceived disability because he was placed on leave and then discharged after failing the alcohol test. Tomek contended that STP defamed him because it "caused to be published communications to nuclear power facilities throughout the country that confirmed he was denied access because of the failure of a drug and/or alcohol test." Dkt. 1-5 at 2–3.

STP removed the case to federal court based on federal question jurisdiction alleging that federal law and corresponding regulations governing nuclear safety completely preempt the alleged state causes of action. Tomek did not contest removal.

STP now moves for summary judgment, claiming that the doctrine of federal preemption precludes Tomek's claims for affirmative relief.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Bryant v. CIT Grp./Consumer Fin., Inc.*, 303 F. Supp. 3d 515, 522 (S.D. Tex. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "The party seeking summary judgment need not produce evidence negating the existence of material fact, but need only point out the absence of evidence supporting the other party's case." *Hicks v. BP Expl. & Prod., Inc.*, 310 F. Supp. 3d 754, 757–58 (E.D. La. 2018) (citation omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *See Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 653 (N.D. Tex. 2018).

When the moving party has met its Rule 56 burden, the nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *See Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'"

3

*Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). A genuine issue of material fact exists when the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted." *Harmon v. Dallas Cty.*, 294 F. Supp. 3d 548, 560 (N.D. Tex. 2018) (citing *Celotex*, 477 U.S. at 322–23).

### III. FEDERAL REGULATIONS GOVERNING NUCLEAR SAFETY

As the operator of a nuclear power plant, STP must follow the requirements of federal nuclear laws, including the Atomic Energy Act, 42 U.S.C. § 2011 *et seq.*, the Energy Organization Reorganization Act, 42 U.S.C. § 5801 *et seq.*, and the accompanying regulations promulgated by the Nuclear Regulatory Commission ("NRC regulations"). The obvious purpose of these various laws and regulations is to ensure that nuclear facilities are properly operated to protect the public from a catastrophic accident.

NRC regulations require nuclear power plant licensees to implement an Access Authorization Program ("AAP") for employees seeking access to the sensitive areas of the plant. *See* 10 C.F.R. § 73.56(a)–(b). The AAP must "provide high assurance" that employees "are trustworthy and reliable, such that they do not constitute an unreasonable risk to public health and safety or the common defense and security, including the potential to commit radiological sabotage." 10 C.F.R. § 73.56(c). Accordingly, before an employee is granted unescorted access authorization privileges, he or she must

4

undergo a drug and alcohol screening, a robust background investigation, and a psychological assessment. *See* 10 C.F.R. §§ 26.65; 73.56(d)–(e). Tomek's position as a Supervisor in the Radiation Protection Unit required him to obtain and maintain unescorted access authorization at the STP nuclear plant.

NRC regulations also impose on nuclear reactor licensees an obligation to implement a Fitness for Duty Programs ("FFD Program") to monitor those individuals who receive unescorted access to nuclear power plants. *See* 10 C.F.R. § 26.21. A FFD Program must:

> (a) Provide reasonable assurance that individuals are trustworthy and reliable as demonstrated by the avoidance of substance abuse;
>
> (b) Provide reasonable assurance that individuals are not under the influence of any substance, legal or illegal, or mentally or physically impaired from any cause, which in any way adversely affects their ability to safely and competently perform their duties;
>
> (c) Provide reasonable measures for the early detection of individuals who are not fit to perform the duties that require them to be subject to the FFD program; [and]
>
> (d) Provide reasonable assurance that the workplaces subject to this part are free from the presence and effects of illegal drugs and alcohol

10 C.F.R. § 26.23. As part of their FFD Program, nuclear plants must "implement drug and alcohol testing programs" and "administer drug and alcohol tests." 10 C.F.R § 26.31(a), (c). This drug and alcohol testing should not only be administered "[i]n response to an individual's observed behavior or physical condition indicating possible substance abuse" but also "[o]n a statistically random and unannounced basis, so that all

5

individuals in the population subject to testing have an equal probability of being selected and tested." 10 C.F.R § 26.31(c)(2), (c)(5).

The NRC regulations also require nuclear licensees to establish, implement, and maintain their own written policies and procedures to meet the general performance objectives and applicable requirements of the regulations. *See* 10 C.F.R. § 26.27(a), (c). Those policies and procedures must, among other things, describe the consequences of violating the FFD Program. *See* 10 C.F.R. § 26.26(b)(8). STP had adopted a FFD Policy that is consistent with NRC regulations.

## IV. FEDERAL PREEMPTION

"Under the doctrine of federal preemption, a federal law supersedes or supplants an inconsistent state law or regulation." *United States v. Zadeh*, 820 F.3d 746, 751 (5th Cir. 2016) (citation omitted). In determining the nature and reach of federal preemption, Congress's intent is the "ultimate touchstone." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (citation omitted).

There are three types of federal preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. Express preemption requires Congress to explicitly state its intent to preempt a state law. *See English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990). "Field preemption occurs when Congress intends to 'occupy the field,' taking over a field of law to the exclusion of state or local authority." *Zadeh*, 820 F.3d at 751 (citing *Sprietsma v. Mercury Marine*, 537 U.S. 51, 64 (2002)). Finally, conflict preemption bars a state law that conflicts with federal law or "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *English*,

496 U.S. at 78–79 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). The doctrines of field preemption and conflict preemption are at issue in this case.

**A.     Field Preemption**

"[I]n the absence of explicit statutory language, state law is pre-empted where it regulates conduct in a field that Congress intended the Federal Government to occupy exclusively." *English*, 496 U.S. at 79. *See also Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 248 (1984) ("If Congress evidences an intent to occupy a given field, any state law falling within that field is preempted.").

Historically, federal regulation of the nuclear industry has been extensive. Indeed, "the federal government has occupied the entire field of nuclear safety concerns, except the limited powers expressly ceded to the States." *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 212 (1983). *See also N. States Power Co. v. Minnesota*, 447 F.2d 1143, 1154 (8th Cir. 1971), *aff'd*, 405 U.S. 1035 (1972) ("the federal government has exclusive authority under the doctrine of preemption to regulate the construction and operation of nuclear power plants"). As the Eighth Circuit has recognized, the enveloping nature of nuclear regulations supports field preemption:

> The federal licensing scheme to control the development and utilization of atomic energy, as established by Congress and implemented by the [Atomic Energy Commission], is extraordinarily pervasive, probably more pervasive than any regulatory scheme considered by the Supreme Court in analogous [pre-emption] cases . . . .

*N. States Power*, 447 F.2d at 1153 (citation and internal quotation marks omitted).

The Supreme Court has observed that "not every state law that in some remote way may affect nuclear safety decisions made by those who build and run nuclear facilities can be said to fall within the pre-empted field."[1] *English*, 496 U.S. at 85. "[F]or a state law to fall within the preempted zone, it must have some direct and substantial effect on the decisions made by those who . . . operate nuclear facilities concerning radiological safety levels." *Id.*

### 1. TCHRA

In moving for summary judgment, STP contends that Tomek's TCHRA claim squarely falls within the preempted field of nuclear safety. The Court agrees. Although there are no Fifth Circuit cases addressing federal preemption in the context of the field of nuclear safety, there are numerous cases from other jurisdictions providing guidance on how the preemption doctrine intersects with nuclear safety issues.

In *Boldt v. N. States Power Co.*, for example, a nuclear power plant employee exhibited signs of intoxication while at work. 259 F. Supp. 3d 954, 959 (D. Minn. 2017). In response, the company operating the nuclear power plant placed certain restrictions on the employee to maintain his unescorted access authorization, including the obligation to submit to ethyl glucuronide ("E.G.") testing. *See id.* at 960. Concerned that the tests would detect trace amounts of E.G. in his urine from sources such as toothpaste, mouthwash, and hairspray, the employee quit his employment and then sued the company

---

[1] By way of example, the Supreme Court explained: "We have no doubt, for instance, that the application of state minimum wage and child labor laws to employees at nuclear facilities would not be pre-empted, even though these laws could be said to affect tangentially some of the resource allocation decisions that might have a bearing on radiological safety." *English*, 496 U.S. at 85.

8

under the Minnesota Human Rights Act ("MHRA") for discrimination based on a perceived disability of alcoholism.[2] *See id.* The *Boldt* Court found the employee's MHRA claim was preempted by federal law governing nuclear safety:

> A claim under the MHRA for disability discrimination based on perceived alcoholism has the potential to affect radiological safety decisions because an employer is forced to decide between: (1) being potentially liable under the MHRA for imposing alcohol testing and other conditions . . . on a member of a protected class, or (2) allowing an employee who the employer . . . regards as having a substance abuse problem to continue to have condition-free unescorted access to protected areas of a nuclear power plant.

*Id.* at 963.

In *Hanni v. Cleveland Elec. Illuminating Co.*, a nuclear plant operator discovered that its employee had been charged with multiple offenses outside the workplace, including felonious assault, driving under the influence of alcohol, and driving without a valid driver's license. 622 N.E. 2d 340, 341 (Ohio Ct. App. 1993). Based on these facts, the employer concluded that the employee was untrustworthy and unreliable per NRC regulations, revoked his unescorted access authorization, and ultimately terminated his employment. *See id.* The employee filed a wrongful termination suit under state law.

On appeal, the Ohio state appellate court found field preemption, holding that that "impeding [the employer's] ability to discharge an employee pursuant to NRC regulations which are expressly aimed at promoting safety in nuclear facilities, is a direct

---

[2] The MHRA, TCHRA, and the Americans with Disabilities Act ("ADA") all prohibit discrimination in the workplace that is based on a disability. *See Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473 (5th Cir. 2006); *Reiff v. Interim Pers., Inc.*, 906 F. Supp. 1280, 1292 (D. Minn. 1995). The statutes are substantially similar and courts look to federal precedent in the ADA in interpreting the MHRA and TCHRA. *Id.*

9

and substantial interference with those regulations." *Id.* at 346. The *Hanni* court explained:

> Such prohibition [from either revoking appellant's access authorization or his employment clearance] would undermine the federal government's regulations in the area of nuclear safety because it is expressly stated that a lack of reliability or trustworthiness is relevant to the NRC's interest in assuring the safe operation of these facilities. As such, the federal regulations preempt the state tort law of wrongful discharge because [the employer], under these circumstances, could not accomplish and execute the objectives of the regulations if it were susceptible to state wrongful discharge claims.

*Id.* at 345.

Using the same reasoning as *Boldt* and *Hanni*, the Court recommends dismissal of Tomek's TCHRA claim under the principle of field preemption.[3] "Given the pervasive nature of the NRC's regulations governing the safety of operations at a nuclear power plant, . . . it is clear that the proper standard for ascertaining [Tomek's] fitness for duty is derived from federal law." *Burns Int'l Sec. Servs., Inc. v. Commonwealth*, 547 A.2d 818, 823 (Pa. Commw. Ct. 1988). NRC regulations are clearly intended to ensure that nuclear facilities are operated in a safe and reliable manner.[4] To that end, the NRC regulations

---

[3] The TCHRA prohibits employers from, among other things, discriminating against an employee because of a disability in connection with compensation or the terms, conditions, or privileges of employment. *See* TEX. LAB. CODE § 21.051(1). In enacting the TCHRA, the Texas Legislature intended to correlate "state law with federal law in the area of discrimination in employment." *Gold v. Exxon Corp.*, 960 S.W.2d 378, 380 (Tex. App.—Houston [14th Dist.] 1998, no writ) (citation and internal quotation marks omitted).

[4] In connection with this discussion, it is worth noting the blatantly obvious: if a nuclear power plant experienced a catastrophe, the consequences could be beyond imagination. As such, safety is paramount and "nuclear power plant employees have diminished workplace rights because 'the danger of catastrophic loss of health and life is so great.'" *McNelis v. Pa. Power & Light Co.*, 867 F.3d 411, 417 (3d Cir. 2017) (quoting *Rushton v. Neb. Pub. Power Dist.*, 844 F.2d 562, 565 n.5 (8th Cir. 1988)).

give nuclear plant operators the ability to limit employees' access to nuclear facilities. Forcing nuclear plant operators to consider the ramifications of all employment decisions under state wrongful discharge laws, such as the TCHRA, frustrates the underlying objective of the NRC regulations. There is simply no question in the Court's view that the TCHRA's requirements related to disability discrimination for perceived alcoholism have a "direct and substantial effect on the decisions by those who . . . operate nuclear facilities." *English*, 496 U.S. at 85. Field preemption, therefore, bars Tomek's TCHRA claim.

2.  **Defamation**

STP next argues that Tomek's state law defamation claim should be dismissed under the field preemption doctrine. The Court is not persuaded. Without a finding of clear congressional intent to preempt state courts from hearing a defamation cause of action, the Court must presume that field preemption does not apply. *See Tex. Midstream Gas Servs., LLC v. City of Grand Prairie*, 608 F.3d 200, 210 (5th Cir. 2010) ("Field preemption requires a clear manifestation of congressional intent."). As a result, even though the Court has already recommended Tomek's TCHRA claim be dismissed on the basis of field preemption, the Court will not blindly apply field preemption to bar a state law defamation claim.

A determination as to the applicability of field preemption requires a case-by-case analysis of the asserted claims compared against the precise scope of the federal regulatory scheme. *See Witty v. Delta Airlines*, 366 F.3d 380, 383–84 (5th Cir. 2004). If a state statute "was enacted with the purpose of protecting against radiation hazards, or if

11

state regulation directly affected radiological safety regardless of the regulation's purposes" it is preempted. *Missouri v. Westinghouse Elec., LLC*, 487 F. Supp. 2d 1076, 1085 (E.D. Mo. 2007) (citing *English*, 496 U.S. at 79). Where, as here, a state law is not motivated by nuclear safety concerns, field preemption occurs where the "tort claim is so related to the radiological safety aspects involved in the operation of a nuclear facility, that it falls within the pre-empted field." *English*, 496 U.S. at 84–85 (citation, internal quotation marks, and alterations omitted).

In *English*, an employee of a nuclear-fuel production facility brought suit against her employer, claiming that the employer took retaliatory action after she made nuclear safety complaints. The question before the Supreme Court was whether federal law preempted a state cause of action for intentional infliction of emotional distress. The high court held that the state law claim did "not fall within the pre-empted field of nuclear safety." *Id.* at 90. The instant case is similar to *English* when it comes to field preemption. Texas state defamation laws do not have a "direct and substantial effect on the decisions made by those who build or operate nuclear facilities concerning radiological safety levels." *Id.* at 79. As such, field preemption will not bar Tomek's defamation cause of action.

**B.  Conflict Preemption**

Under the doctrine of conflict preemption, a state law is preempted when "it actually conflicts with federal law," such as "where it is impossible for a private party to comply with both state and federal requirements," or where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of

12

Congress." *English*, 496 U.S. at 79 (citations and internal quotation marks omitted). In this case, Tomek's TCHRA and defamation claims are preempted under conflict preemption.

### 1. TCHRA

Simply stated, it would be impossible for STP to comply with NRC regulations and the TCHRA. The NRC regulations require STP to place restrictions on facility access or terminate employment when an employee fails a drug or alcohol test. The TCHRA, on the other hand, prohibits employers from discharging an employee based on a perceived disability such as alcoholism. These two worlds cannot co-exist. Liability under the TCHRA for disability discrimination based on perceived alcoholism would force employers to make a Hobson's choice—face potential liability under the TCHRA for taking an adverse action in response to a failed alcohol test or permit an employee with a possible substance abuse problem continued, unconditional access to a nuclear plant. "The NRC regulations do not exempt individuals with disabilities, and indeed, it would be strangely ineffective for them to do so; the fact that a certain trait or behavior coincides with a recognized disability does not make it any less dangerous to the public." *McNelis*, 867 F.3d at 417 (holding that "NRC regulations explicitly require nuclear power plants to screen for traits and behaviors in a manner that in other contexts may violate the ADA"). Because STP could not have disregarded the TCHRA's requirements without violating federal law, Tomek's TCHRA claim is preempted.

Tomek contends that there is no conflict between NRC regulations and the TCHRA. In making this argument, Tomek claims that "STP has gone beyond what is

13

required by the NRC when it created its policy to fire employees who fail one drug test." Dkt. 17 at 10. This argument evidences a fundamental misunderstanding of the NRC regulations. The NRC regulations "define[] the minimum sanctions that licensees and other entities shall impose when an individual has violated the drug and alcohol provisions of an FFD policy." 10 C.F.R. § 26.75(a). The minimum sanction specified by NRC regulations for an individual failing an alcohol test is a 14-day termination of that person's unescorted access authorization for a first occurrence, a five-year denial for a second occurrence, and a permanent denial for a third occurrence. *See* 10 C.F.R. § 26.75(e)(1), (e)(2), (g). Importantly, the federal regulations specify that the 14-day access termination for a first occurrence is a **minimum** sanction. *See* 10 C.F.R. § 26.75(a). The regulations specify that a licensee "may impose more stringent sanctions." *Id.* Consistent with NRC regulations, STP enacted a more stringent standard. Under STP's FFD Policy, failing an alcohol test will result in a five-year denial of access for a first occurrence. As a consequence, there is a direct conflict between the NRC regulations and the TCHRA. Thus, conflict preemption precludes Tomek's TCHRA claim.

## 2.  Defamation

Tomek's lawsuit describes his state law defamation claim as follows:

[STP] caused to be published communications to nuclear power facilities throughout the country that confirmed that he was denied access because of the failure of a drug and/or alcohol test. This communication was either false and was maliciously communicated or was made in reckless disregard for truth.

14

Dkt 1-5 at 2–3. Although Tomek criticizes STP for disseminating information about his failed alcohol test to other nuclear facilities, such conduct is expressly required by NRC regulations.

Personal Access Data System ("PADS") is a database used by the commercial nuclear power industry to share information necessary to process applications of workers for access to nuclear facilities. *See Gerhart v. Exelon Corp.*, 461 F. App'x 143, 144 n.1 (3d Cir. 2012). To help determine what information can be shared with others in the nuclear power industry, power plant operators turn to the NRC regulations, which contain a comprehensive framework for creating, maintaining, and sharing information with other nuclear plants concerning an individual's fitness to access nuclear facilities. For example, the NRC regulations specifically provide that licensees are entitled to rely on the information that other licensees "developed about individuals during periods in which the individuals maintained unescorted access or unescorted access authorization status." 10 C.F.R. § 73.56(h)(6). NRC regulations require that a nuclear plant such as STP inform the NRC if a supervisory personnel is determined to have violated the plant's FFD Policy. *See* 10 C.F.R § 26.719(a). Moreover, the NRC regulations specifically provide that a nuclear power operator, like STP, is required to "make available [to other licensees, applicants, contractors and vendors] the personal or access authorization information requested regarding the denial or unfavorable termination of unescorted access or unescorted access authorization."[6] 10 C.F.R. § 73.56(d)(4)(v). Licensees are expressly

---

[6] As part of the process to obtain unescorted access to the STP plant, Tomek signed a NEI Standard Consent Form ("Consent Form") in which he agreed that STP could obtain, retain and

15

prohibited from permitting "an individual, who is identified as having an access-denied status by another licensee . . ., or has an access authorization status other than favorably terminated, to enter any nuclear power plant protected area or vital area, under escort or otherwise . . ." 10 C.F.R. § 73.56(h)(3).

To allow Tomek to pursue a state law defamation claim would put STP between a proverbial rock and a hard place. STP would have to choose between reporting Tomek's termination in PADS (and face liability under state defamation laws) or refuse to submit Tomek's termination to PADS (and run afoul of NRC regulations). This is exactly the type of situation that screams for application of the conflict preemption doctrine. Because it is impossible for STP to comply with both state and federal requirements, conflict preemption bars Tomek's state law defamation claim.[7]

---

transfer information to other licensees necessary to determine whether to grant him unescorted access to a nuclear facility. The Consent Form specifically noted that the NRC requires that this information "be used in determining that an individual is trustworthy, reliable, and fit for duty prior to granting and while maintaining [unescorted access]. The results of this determination must be available to other NRC licensed facilities." Dkt 16-4 at 1. In the Consent Form, Tomek also acknowledged that he understood "that this system is intended to permit nuclear facility licensees and their accepted contractors/vendors to meet regulatory requirements mandating that certain information be available to any facility licensee by retaining certain access information in a central computer database." *Id.*

[7] It is well-settled that the doctrine of conflict preemption can apply to a defamation claim. *See, e.g., Purcell v. Bank of Am.*, 659 F.3d 622, 624 (7th Cir. 2011) (Fair Credit Reporting Act preempted state law defamation claim); *Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 433 (5th Cir. 2004) (Employee Retirement Income Security Act preempted plaintiff's state law defamation claim); *Peffley v. Durakool, Inc.*, 669 F. Supp. 1453, 1462 (N.D. Ind. 1987) (the Labor Management Relations Act can, in certain cases, preempt a state law defamation claim).

## V. CONCLUSION AND RECOMMENDATION

For the reasons stated above, the Court RECOMMENDS that STP's Motion for Summary Judgment (Dkt. 16) be GRANTED.[8]

The Clerk shall provide copies of this Memorandum and Recommendation to the respective parties who have fourteen days from the receipt thereof to file written objections pursuant to Federal Rule of Civil Procedure 72(b) and General Order 2002–13. Failure to file written objections within the time period mentioned shall bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

SIGNED at Galveston, Texas, this 28th day of August, 2018.

ANDREW M. EDISON
UNITED STATES MAGISTRATE JUDGE

---

[8] The gravamen of Tomek's claim is that the integrity of STP's drug and alcohol testing process was compromised, leading to inaccurate test results. It is worth noting that although Tomek's TCHRA and defamation claims are preempted by federal law, Tomek still had an avenue to challenge the decision denying him access to the STP facility. See 10 C.F.R. §§ 26.39, 73.56(l). Tomek requested and received through the administrative process an "impartial and independent internal management review" and was given "an opportunity to provide additional relevant information and an opportunity for an objective review of the information upon which the [decision] was based." 10 C.F.R. § 73.56(l). The internal management review denied Tomek's appeal and supported the original decision denying unescorted access.